In the Matter of the Petition of GEORGE MATULEWICH to Prove the Last Will and Testament of MARY MATULEWICZ, Also Known as MARY MATULEWICH, Deceased.

JUSTINE MESSAGE, an Infant, by JOHN MESSAGE, Her General Guardian, and GEORGE H. BURTIS, Her Special Guardian, Appellants; GEORGE MATULEWICH, as Executor, etc., of MARY MATULEWICZ, etc., Deceased, Respondent.

Second Department, January 11, 1935.

*George H. Burtis* and *Clement F. Rozanski*, for the appellants.

*Conrad Saxe Keyes*, for the respondent.

TOMPKINS, J.   Mary Matulewicz, a widow, seventy-one years of age, died at the home of her son, George, in Alpine, N. J., on June 7, 1933.   Her only heirs at law were her said son and the contestant, Justine Message, fourteen years of age, daughter of her deceased daughter, Margaret Message.   The decedent could not write in any language and could not speak English.   From 1922 to 1929 she lived with her daughter, Margaret Message, and her son-in-law, Dr. Message, the parents of the contestant, and after her daughter's death, in 1929, continued to live with her son-in-law until 1930, when he remarried.   Soon thereafter decedent established her home in one of her properties in Brooklyn.   Her son, George, a lawyer, lived, and still lives, in Alpine, N. J.; and he drew and superintended the execution of the paper dated March 23, 1933, while the decedent was visiting at his home and was confined to her bed by illness, and by its provisions he was given all of

decedent's property, approximately $21,800 in value, and was made the sole executor thereof.

When the paper was offered for probate in the Kings County Surrogate's Court, the special guardian of Justine Message filed objections to its probate. Issues were framed for a jury trial, and at the conclusion of the proofs the surrogate directed a verdict on all the issues in favor of the proponent.

The testamentary capacity of the decedent is conceded.

The grounds of the contest are: *First*, that the execution of the will was procured through the undue influence of the decedent's son, George, the draftsman of the paper offered for probate and who is named as executor and the sole beneficiary; *second*, that the decedent did not know or understand the contents or provisions of the instrument.

Louis Morris, a lawyer occupying offices with George in Newark, N. J., and one Winifred Strohecker, a neighbor and friend of George's family, were the subscribing witnesses. George took Morris from Newark to Alpine on the day of the alleged execution of the document, while Mrs. Strohecker was called to George's home by his wife. There they found the decedent propped up on pillows in bed. Morris testified that when he read a paragraph in the document in reference to a trust fund for the benefit of Justine, the decedent " looked at me, dropped her voice some and said, ' Make George look after Justine.' "

It appears that there was compliance with the statutory formalities for the execution of a will.

The following is the substance of the proofs on behalf of the contestant in support of the claim that the decedent did not know the nature or contents of the instrument to which she made her mark and that she was unduly influenced by George.

Dr. Protzman, witness for the proponent, testified that he attended the decedent on March 22, 1933, and while talking with her about her physical condition she said, " I am an old lady and I have no will," and that the witness told her " the proper thing for her to do would be to make a will out to relieve her mind of anything that might be worrying her." (According to the testimony of Louis Morris, one of the subscribing witnesses, the will had already been typewritten, on the day before, by decedent's son, George, in his Newark law office.)

Dr. Waluk frequently saw the decedent at his home in Brooklyn during the summer of 1933, and between 1922 and 1929 he often saw her with her granddaughter, Justine, at Dr. Message's home where she lived until after the death of her daughter, Mrs. Message; that after her daughter's death " she was worrying that Justine

would be neglected if she died and that she will provide for Justine so she would be taken care of. * * * She worried more when Dr. Message married his second wife, if he got a new child by his second wife this child would be still more neglected * * *. She said she was going to take care of her." This witness further testified that in the month of May, 1933, when she returned from a visit to her son, George, in New Jersey (two months after the date of the alleged will), the decedent said " she was worrying about her, as I said before. If she died, who was going to take care of Justine. That is what she was worrying about and she was worrying about how she would provide for Justine so she would be taken care of; " that " she was always talking about Justine. * * * Since her mother died why she was worrying about how the orphan child will live."

Benedict J. Schegauf was the decedent's insurance broker and frequently saw decedent at Dr. Message's home from 1921 to 1924, and that she manifested " a great love and affection for the child all the time. * * * She would not let * * * her eyes for a moment from the child. If the child was here or there she used to go after her. She worried more about the child than the mother did. * * * She told me that she brought up Justine from childhood * * *. That she loved her so much and that she will take care of Justine as long as she lives." In the month of May, 1933 (two months after the execution of the document in question), the witness met decedent at the home of Dr. Message where Justine was living; that the doctor said, " Grandma, you know two women can't be bosses here. I am married now and you got to leave everything in the care of my present wife. She is the boss. You cannot be boss here any more." That decedent took the witness to the living room and for about two hours talked " about that the doctor neglected Justine; the doctor did not take care of Justine properly; " that the witness said, " Why do you insist coming here. You know the doctor is married and this is not your home and you would be annoyed and have arguments with the doctor. Why don't you keep away from him for a while." That she replied, " I cannot. I love Justine so much that I could not sleep well at night if I did not see her going to bed. * * * I must see that she won't run around on the street. * * * Since my daughter died that is the only thing that is left now in Justine and I promised my daughter Margaret that as long as I lived I will take care of her and I will provide for her and that she will be taken care of and that I am willing to stand all the abuse that Dr. Message will give to me." (These conversations were two months after the execution of the alleged will.)

Joseph Ambraziejus, a steamship ticket agent, knew decedent about twenty-five years; that she always worried about Justine — that she was more like a daughter; that in April, 1933, the decedent said: " You know I got a deep heart. I am worrying about Justine. * * * It makes no difference. I will some day die. I leave fifty to my son and fifty to Justine." (This conversation was a month after the document in question was executed.)

Natalie Kulbok testified that in May, 1933, decedent said: " I have no time to be lonesome because when I get up in the morning I do my business and I go down to Dr. Message's house and see Justine, how she gets to eat and what to give her to eat, and then after three o'clock I go back again and watch for Justine when she comes home from school, how she plays. If she plays her piano lessons, and when I put her to bed and everything, I go home and go to bed myself. * * * I have to live for Justine because Justine has nobody only me. If I die who is going to take care of Justine * * *. Nobody else is left only me to care for Justine."

Helen Juskowski was a tenant of the decedent for five or six years. She testified that decedent was always worrying about Justine, about her clothes and her meals, and that when she was sick " she used to worry a lot about her. * * * She used to worry that the doctor didn't take proper care of Justine and that it is up to her to take care of Justine. That she used to bring her up while she was a baby. She used to take care of her bath, food, take her out * * *. She took more care of Justine than Justine's mother; " that the day before Easter, 1933, decedent visited the witness and had some tulips, a present from Justine, and that on that occasion, among other things, decedent, referring to Justine, said: " If grandma dies she is going to be well provided. Justine is going to have enough some day." (This conversation was after the execution of the paper propounded as the will of the decedent.) This witness also testified that the decedent " used to visit Justine when she was home almost every night * * * to see that Justine goes to sleep, and that she would have her supper and everything. * * * She liked the doctor but after he got married she didn't have much use for the doctor. She said if it would not be for Justine she would never go over to see the doctor or the doctor's wife."

It appears without dispute that, after the death of Justine's mother, her father, Dr. Message, as executor of his wife's estate, assigned to the decedent, in trust for Justine, certain shares of stock in the Lithuanian Building and Loan Association of Newark, which had been owned by the doctor's wife.

Holbein S. Treciokas, secretary of that association, testified that the decedent's son, George, was attorney for the association for several years; that in March, 1933, George gave to the witness a paper purporting to have been executed by the decedent on the twenty-third day of that month (the date of the execution of the will), by which those shares of building and loan association stock were assigned to her son George, and transferred on the books of the association to George Matulewich, individually, and are still in his name.

The facts and circumstances developed at the trial in support of the objections to probate, when summarized, are as follows: The decedent was seventy-one years of age at the time of her death and was confined to a bed in the home of her son, George, at the time of the execution of the alleged will. Her only heirs at law were her son, George, and her infant granddaughter, Justine, the only child of a deceased daughter who died in April, 1929. She had an extreme fondness and deep affection for her granddaughter, Justine, and an unusually keen interest in and solicitude for her welfare and future. After the execution of the paper offered for probate, she made to several of her friends and neighbors many statements that she was going to take care of Justine during her lifetime and make provision for her after her death. To one witness she said that she would " leave fifty to my son and fifty to Justine." Her son, George, the sole legatee and devisee as well as the sole executor, is a lawyer, and he personally prepared and typed said paper on March 22, 1933, the day before it was taken by him to Alpine and executed under his supervision. George and his wife procured the subscribing witnesses, while he produced the document and provided the pen. There was no proof that any instructions were given by the decedent for the preparation of the will or as to what it should contain. There was testimony by Dr. Protzman that on March 22, 1933, the day before the alleged will was executed, decedent said to him, " I am an old lady and I have no will," to which the witness replied that the proper thing was for her to make a will, when as a matter of fact, according to the testimony of Morris, a subscribing witness, the typewritten paper which was executed the next day had already been prepared by George and had been shown to the witness in George's office in Newark on March twenty-second. There is no pretense that George saw his mother after her talk with Dr. Protzman until he appeared with the paper and Morris on March twenty-third. The alleged will made no provision for the granddaughter, Justine, which is wholly inconsistent with the relations existing between them from the child's birth to the death of decedent. Particularly

significant is the statement of decedent to the witness Morris after the reading of the second paragraph of the alleged will, namely, " Make George look after Justine." In my opinion, this indicates that she intended and expected that George would make suitable provision for Justine in the paper. The second paragraph of the alleged will reads as follows: " During my lifetime I provided a trust fund for my Granddaughter, Justine Message, which I consider a gift and in lieu of any further gift or devise." This paragraph, instead of making provision for Justine, was, in effect, a disinheritance of her. It appears that, early in Justine's life, the decedent opened an account in a savings bank in trust for her granddaughter, which, at the time of decedent's death, amounted to approximately $950. Likewise, decedent opened a similar account in trust for Gloria, daughter of her son, George, which, at the date of her death, amounted to about $485. Both of these bank accounts were built up by small contributions by decedent from time to time, on birthdays and holidays.

One of the witnesses to the paper purporting to have been executed by decedent on March 23, 1933, assigning to her son, George, the building and loan association stock to which we have already referred, is Winifred Strohecker, one of the subscribing witnesses to the alleged will, and the other witness is George's wife. Winifred Strohecker testified, however, that on that occasion the decedent signed only one paper in her presence. This assignment to George of stock that decedent held in trust for Justine seems to me to be indicative of the influence of George over his mother and requires explanation.

The foregoing circumstances taken together, without contradiction or explanation, and the reasonable inferences to be drawn therefrom, required a submission of the following issues to the jury: Did the decedent know the contents of the paper offered for probate as her will, and did that paper express the testamentary disposition intended by her? Was the execution of said paper caused or procured by the undue influence of any person or persons? Was its execution caused or procured by fraud?

The decree of the Surrogate's Court should be reversed on the law and the facts and a new trial ordered before the surrogate and a jury, costs to abide the event.

LAZANSKY, P. J., and CARSWELL, J., concur; HAGARTY and DAVIS, JJ., dissent and vote to affirm on the ground that it appears conclusively that the testatrix was a woman of keen, alert mind, capable of handling her business affairs and not easily susceptible to influence. The will was read to her with care by an attorney who had no

interest in the matter and she approved its contents. The evidence concerning her purpose to provide for the granddaughter consists almost entirely of alleged declarations by her to persons after the will had been executed. She had recovered from the illness said to exist at the time the will was drawn and she was up and about with plenty of opportunity to have a new will prepared if such had been her purpose in respect to providing for her granddaughter.

Decree of the Surrogate's Court of Kings county reversed on the law and the facts and a new trial ordered before the surrogate and a jury, costs to abide the event.